## Title Guaranty & Surety Company v. Hay, et al.

(Decided May 27, 1915.)

Appeal from Franklin Circuit Court.

1. Evidence—Section 606, Subsection 2, Civil Code.—Under Subsection 2 of Section 606 of the Civil Code of Practice, a person cannot testify for himself concerning any verbal statement of one who is dead when the testimony is offered to be given.

2. Evidence—Section 606, Subsection 2, Civil Code.—Where the local agent of a guaranty company, with three other persons, executed a bond indemnifying his company against loss by reason of its suretyship upon the contract of a third person to complete a public road, and the local agent and his associates subsequently took over the road to complete it after the failure of the original contractor, the local agent was acting for himself and not for his

company, and he could not, under Subsection 2 of Section 606 of the Civil Code of Practice, testify concerning a verbal agreement with the general agent of the guaranty company, who was dead at the time the testimony was offered.

3. Trial—Instructions.—Where the plaintiff sued to recover compensation for work alleged to have been performed at the request of the defendant, it was error for the court to instruct the jury to find for the plaintiff if they believed from the evidence that the defendant had "authorized" the plaintiff to do the work.

BROWN & NUCKOLS for appellant.

O'REAR & WILLIAMS for appellees.

Opinion of the Court by Judge Hannah—Reversing.

In 1911, George B. Harper, with the appellant as his surety, contracted with the fiscal court of Franklin County to construct four miles of turnpike road, running from the Lawrenceburg Turnpike Road to the Lane's Mill Turnpike Road, and the branch thereof, for $5,500.00. In consideration of the appellant becoming Harper's surety for the completion of his contract, as above recited, the appellees, C. W. Hay, D. D. Smith, George Baker, George W. Mills and T. M. Horton agreed and undertook, in writing, to indemnify the appellant to the extent of $2,000.00 against any loss which it might sustain by reason of its suretyship for Harper.

Harper failed to carry out his contract, and during the month of November, 1911, the appellees took charge of Harper's work and completed it within the next twelve months, at a cost of $13,819.12.

About the time that Harper defaulted in his work he gave to the appellee, Smith, who was acting for himself and his co-appellees, the following order upon the judge of the fiscal court:

"November 14th, 1911.

"Judge R. C. Hieatt,
        "Frankfort, Ky.

"Please pay to D. D. Smith, as representative of my bondsmen, all money due me under a contract for construction of the Lane's Mill and Farmdale Turnpike. This order to take precedence over all orders given by me. Yours truly,

"George B. Harper.

"Accepted,
        R. C. Hieatt, County Judge."

· Under that order the fiscal court paid $4,600.00 during the course of the work. Adding to the $4,600.00 the $2,000.00 secured by appellees' bond indemnifying appellant, and deducting the $6,600.00 thus found from the $13,819.12, there remained a balance of $7,219.12.

To recover this balance the appellees brought this action against the appellant guaranty company on May 22nd, 1913, alleging that they had done the work necessary to complete Harper's contract at the request of the appellant guaranty company; and having recovered a verdict and judgment for the amount claimed, the guaranty company prosecutes this appeal.

Having been required to make their petition more definite and specific, so as to show whether the agreement with the guaranty company to finish the work was in writing or in parol, the appellees, by an amended petition, alleged it was in parol.

Much the larger part, however, of the proof consists of letters which passed between Samuel K. Bland, of the firm of Bland & Gaunt, general agents for the appellant, at Louisville, and the appellee, D. D. Smith, the local agent for the appellant at Frankfort, and who was acting for himself and the other appellees. As those letters throw considerable light upon the parol agreement which Smith claims to have had with Bland, we will set out the letters in full preliminary to the statements and discussion of the parol agreement.

Chronologically given, the correspondence is as follows:

(No. 1)

"Nov. 14, 1911.

"Mr. S. K. Bland,
        "Louisville, Ky. ·

"Dear Sir:

"I herewith enclose the indemnifying bond in the matter of Geo. B. Harper contract. Mr. Petty refused to sign the indemnifying bond for Mr. Harper, although he admitted to me that he had promised Mr. Harper he would do so. Petty is probably wiser than the balance of us, but we were merely endeavoring to help out a fellow who is down and out. Horton is the only one who agreed to sign with the understanding that Petty would also sign, and he has verbally agreed in the presence of Mr. Hay and myself that he will stay on without Petty's

signature, but we have guaranteed to him that his loss will not exceed $100 in any event, but think you will agree that the balance of the signatures are good for $2,000.

"Mr. Mills is a sub-contractor with Mr. Harper and has about $5,000 worth of road machinery on the contract. T. M. Horton owns a little property in Frankfort and is engineer on the F. & C. Ry. George Baker is part owner of the Frankfort Distillery, and C. W. Hay is G. F. & P. A. of the F. & C. Ry. I would be willing to take a note for $2,000 signed by these names.

"Very truly,
"D. D. SMITH."

(No. 2)

"Nov. 18, 1911.

"D. D. Smith Insurance Agency,
"Frankfort, Ky.

"Gentlemen:

"Referring to the bond executed for Mr. Harper, we will ask you to look into this matter and advise us what is the present status of the contract.

"Yours truly,
"BLAND & GAUNT, Gen. Agents."

(No. 3)

"Nov. 18, 1911.

"Messrs. Bland & Gaunt:

"Mr. Harper was getting along so slowly with this work, and he was unable to finance it properly, so we signers of the indemnifying bond took it over, and I am now in charge of the work through Mr. Mills, who was a sub-contractor for Mr. Harper. Think the Surety Co. is now safe on the proposition, and if anybody gets stuck, it will be us four bondsmen to the Surety Co. Mr. Mills says he will finish the work by the end of the year.

"D. D. SMITH."

(No. 4)

"Louisville, Ky., Nov. 20, 1911.
"Re Geo. B. Harper.

"D. D. Smith,
"Frankfort, Ky.

"Dear Sir:

"We have your communication in regard to the above matter, and we will ask you to watch this as closely as possible. We simply cannot afford to lose anything on

this bond, as I have assured the company that there will be no loss under it. The company was very much dissatisfied with this bond, because it is their policy not to sign bonds for contractors who have no financial responsibility even though there was an indemnifying bond. The result in this case entirely justify their views.

"They also did not like our accepting a $2,000 indemnifying bond on a contract of $5,500. If we lose any money on this contract it will certainly give us a 'black eye.' Very truly,

"BLAND & GAUNT,
"General Agents."

(No. 5)

"Nov. 21, 1911.

"Mr. S. K. Bland:

"Replying to yours of the 20th, I don't think the Surety Company will lose anything, but it looks like us indemnitors are up against it. Harper got so busy 'boozing' he could not attend to the contract, so we took it away from him and paid off all the hands who had been working for him.

"Very truly,
"D. D. SMITH."

(No. 6)

"Dec. 1, 1911.

"Messrs. Bland & Gaunt:

"In regard to George B. Harper contract, beg to say it is still being carried on in the name of Mr. Harper, and he ostensibly is in charge of the work, but he is really merely acting as timekeeper on the job and checking Mr. Mills, who is carrying on the work under our supervision. We are furnishing the money to meet all expense of the work and all payments by the county under the contract are to be made to me as representative of the indemnitors of the Surety Company.

"I go over the pike every Sunday to watch how they are getting along, and Mr. Mills and Mr. Harper both claim that we will get out on the deal without any loss and probably make a little profit for Mr. Harper, as we agreed in taking over the job that any profit that might be made would be turned over to Mr. Harper.

"I don't think there is any chance for the Surety Company to get stuck, as the $2,000 margin will certainly

put it out O. K., but we indemnitors might have to lose something. The work is being pushed as fast as we possible can, weather being considered.

"Very truly,
"D. D. Smith."

"We have advanced more than $1,000 in cash to meet the payrolls, so you can see that we have gone into it in earnest."

(No. 7)

"March 15, 1912.

"Title Guaranty & Surety Co.,
        Louisville, Ky.

"Gentlemen:

"In regard to the bond of Mr. Geo. B. Harper, covering construction of the Lane's Mill Turnpike, beg to ask if we shall go ahead and finish it to the best possible advantage to all concerned, or do you desire to have a representative come to Frankfort and go over the matter before it goes any farther.

"I think we would have gotten out with only about $1,000 loss, which, of course, would have been stood by the indemnitors to the Surety Co., but the weather this winter has been something terrible and the county has been unable to do any rolling, which caused us to haul all the rock over the top of loose rock on the pike, which you can understand made it impossible to haul more than half-loads, and we had to pay teams $3.50 per day, whereas they could not do much more than $2.00 worth of work per day.

"Very truly,
"D. D. Smith."

(No. 8)

"March 18, 1912.

"D. D. Smith Insurance Agency,
        "Frankfort, Ky.

"Gentlemen:

"We have your letter of the 15th instant in regard to the contract of George B. Harper, and, before deciding what the company will do in this matter, we must ask you to furnish us with a statement of the receipts and disbursements, estimate as to how much the contract has been completed, how much it will cost to complete the work. We want a full statement as to what

has been done and what is yet to be done. Of course, the company does not expect to sustain any loss in this matter, if we can help it. As soon as we hear from you, we will communicate the contents of your letter to the company for advice as to what procedure it desires us to follow.                    Yours truly,

            "BLAND & GAUNT, General Agents."

(No. 9)

                "Sept. 10, 1912.

        "Re George B. Harper Contract.
"D. D. Smith Insurance Agency,
            "Frankfort, Ky.

"Gentlemen:

    "We have your communication in regard to the above bond, in which you state that our Mr. Bland instructed you to go ahead and complete the contract. This, as a matter of fact, is not the case. The indemnitors undertook to complete this contract on their own account, and, whereas we knew they were going to complete it, the surety company was not consulted. You wrote us on March 15th relative to this contract, at which time we replied as per copy of letter sent herewith.

                "Yours truly,
        "BLAND & GAUNT, General Agents.'

(No. 10)

                "Sept. 11, 1912.

"S. K. Bland,
        "Louisville, Ky.

"Dear Sir:

    "Replying to your favor of the 10th inst., beg to say think you will remember telling me verbally at the bottom of the elevator shaft where I met you one day in the Columbia Building for us to go ahead and complete the pike to the best possible advantage and the Surety Company would do what was right in the premises.

    "We kept the county officials and the committee in charge of building the pike under the impression that we would lose the entire amount of money which was lost on the contract, and under this plea we got them to let us off of building three concrete bridges which would have cost about $500 each, letting us put in corrugated pipe instead.

"The conversation I had with you in the Columbia Building at Louisville was just a few days after receiving your letter of March 18th, as I had gone down to talk to you about the matter instead of writing.

"Yours very truly,
"D. D. SMITH."

(No. 11)

"Sept. 12, 1912.

"Mr. D. D. Smith,
"Frankfort, Ky.
"Re George B. Harper.

"Dear Sir:

"I have your letter of the 11th instant in regard to the above matter, and I beg to state that I recall the conversation you refer to, but that was prior to my letter to you of March 18th. Never after that time did I receive any sort of instruction or information in regard to the work. I recall the conversation and in it you stated that you were going ahead with the work, but I certainly did not make any statement to the effect that the company would be responsible for anything you did. I have been careful at all times not to commit the company to do anything unless I had to. You did not reply to our letter, consequently we were not required to take any steps in the matter. However, for the present, there is nothing to do but to get a statement of the account. Yours truly,

"SAMUEL K. BLAND."

The appellees claim that the parol agreement under which they completed this work at the request of the appellant, was made between Smith and Bland some time in March 1912, in Louisville. But as Bland had died before the case was tried, Smith was not competent to testify to any agreement with Bland. The court, however, permitted Hay, over the objection of the appellant, to testify as follows:

"Q. Tell the jury, then, the statements made to you by Mr. Smith with reference to the matters in controversy in this case? (Objection overruled.) A. Mr. Smith telephoned, or sent for me, about the middle of November, 1911, and said that Mr. Harper had fallen down on his contract and didn't have money enough to finance it and that he (Mr. Simth) would be compelled to complete it. He said he had been advised by the county judge

and the fiscal court and he had called a meeting of the indemnitors on the two-thousand-dollar bond and met in his office. Q. Who was in the meeting? A. Mr. George Baker, G. W. Mills, D. D. Smith, and myself—I am not sure whether Mr. Horton was there or not. Q. All right, tell what he said. A. Mr. Smith said the road would have to be completed and that if agreeable to us he as agent would handle this matter and try to get the road finished to the best of his ability, and I replied at the time that I was talking to Mr. Smith and the other members—I told them— (Objection overruled.) I told Mr. Smith that we would not lose more than four or five hundred dollars a piece, and it was satisfactory to the other members concerned and the indemnity company, and he thought he would go ahead and do the best he could. Mr. Smith then said he would take over the work as agent and would make no charge for his services and try to get the job completed as best he could. A few days afterwards I met Mr. Smith and asked him if he had notified the bonding company, and he said yes, and I said, 'That is all right then.' About March—the middle of March—Mr. Smith told me it looked like the loss was going to amount to more than he had figured on and we certainly would lose our two thousand dollars, and he said it looked like the indemnity company would lose something, too, and he said he had told them about it also, and I said, 'You had better have a thorough understanding about the matter,' and he said that he was going down to Louisville and see them about it. He came back from Louisville and said he had been down to Louisville, and he said the general agent told him to go ahead with the work and keep a careful account of the work, and when he had completed the job to send them a statement for all over two thousand dollars and they would do what was right in the matter. Q. Were you compelled to put up the money necessary to complete it? A. I think we made up three hundred and fifty dollars in cash and signed a note for twelve hundred dollars, and when they got to my part of it I put up my part in notes and cash and I suggested to Mr. Smith that the bonding company put up the balance as we had gone as far as we were liable, and he said they said for us to go ahead with the work and send them a statement and they would send us all the money at once, but I told

him I had gone as far as I had agreed and I didn't deem it advisable to put up any more.''

Later in his deposition Hay repeated the substance of his testimony as above given.

It will be remembered that in the letters Nos. 9 and 11, introduced by the appellees, and written in September, 1912, Bland strenuously denied having made the statements attributed to him by Smith.

Explaining his letter No. 3, above set forth, in which he states that he had taken over the contract for completion, Smith testified that he was acting for himself and his four co-appellees, who were the makers of the bond of indemnity to the appellant.

For the appellees it is insisted that since they did not begin work upon Harper's contract until about December 1st, 1911, and about ten days after they had received Bland's letter of November 20th, 1911, they were authorized by the terms of that letter to do the work for the guaranty company; and, in their brief, appellees rely upon that letter to sustain the judgment rather than the verbal agreement claimed to have been made in March, 1912, between Smith and Bland.

The petition, however, rests appellees' cause of action upon the verbal promise, and not upon the letter.

Furthermore, when read in connection with the other letters, we fail to see wherein the letter dated November 20th, 1911, gives the authority claimed for it by the appellees. It was merely an answer to Smith's letter of November 18th, announcing the collapse of Harper's enterprise, and the taking over of it by the signers of the indemnifying bond. At most, it was but an expression of disappointment upon Bland's part, and his desire for Smith to guard his company against loss. Bland's letter of November 20th might more properly be termed a mere acquiescence in the action of Smith and the other appellees in taking over the work for themselves, as outlined in Smith's letter of November 18th. At that time Smith did not claim he was acting for appellant.

Throughout these letters written during the year 1911 it is easily apparent that the appellees were acting for themselves in taking charge of Harper's contract, and that they thought they would be able to complete the work for a sum less than Harper's contract price, and.

thereby save something out of the wreck for Harper. Letter No. 6 expressly states this to be their expectation.

The only testimony relating to the verbal contract between Smith and Bland was that of Hay, as above set forth. Appellant insists, however, that this testimony was wholly incompetent, since it merely repeated what Smith told Hay concerning the conversation between Smith and Bland. Under Sub-section 2 of Section 606 of the Civil Code of Practice, the testimony of Smith upon that subject was clearly incompetent; and, if Smith could not testify as to his conversation with Bland, certainly Hay could not make it competent by repeating what Smith told him. On the other hand, if Hay's testimony was competent, Smith's was equally competent. In our opinion, neither was competent.

Appellees contend, however, that Smith was acting for the appellant and not for the appellees throughout these transactions, including his conversation with Bland; and, while they concede that Smith occupied a dual position, they insist his position was not dual in a reprobative sense. And it is further contended by appellees that Smith's co-indemnitors knew he represented the company, as well as themselves, in the matter; that the guaranty company also knew that Smith was working under the Harper contract and making an effort to construct the road for the contract price in order to avert a loss; that all parties knew this; and that the law does not forbid an agency for both parties when the fact of agency is known and consented to by both.

In support of this position appellees rely upon Citizens' State Bank v. Shawnee, 91 Kans., 18, 49 L. R. A. (N. S.), 972. A reading of that opinion, however, will show that it has no application to a case like the one before us.

We think it clear that Smith was acting for himself and his co-appellees, and that it was not competent for him to relate any conversations he had with Bland. And, as above stated, if Smith was not competent, Hay was equally incompetent to repeat the incompetent statements of Smith. With Hay's testimony excluded, there was no proof upon which there could be a recovery, and the appellant's motion for a peremptory instruction should have been sustained.

The court gave but one instruction; it reads as follows:

"The court instructs the jury that if they shall believe from the evidence that defendant, through its agent or agents, authorized the plaintiffs to proceed to the completion of Harper's contract, and that in so doing they in good faith expended on behalf of defendant any sum of money, then the jury should find for plaintiffs whatever sum the jury may believe from the evidence they expended, not to exceed $9,219.12, and shall deduct therefrom $2,000.00; and unless they so believe, they ought to find for defendant."

Appellant complains, and we think justly, that this instruction is erroneous and misleading, in that it justified the jury in finding for the plaintiff in case it should believe that the guaranty company, through either Smith or Bland, authorized the appellees to complete Harper's contract.

It is true that both Smith and Bland were agents of the appellant in its ordinary business; but in this transaction Smith was acting for himself and the other appellees, while Bland was the agent for the guaranty company, and in this transaction was Smith's adversary.

Under the facts of this case, the instruction should have confined the jury to a consideration of the acts of the appellant through its agent Bland. Although Bland was a member of the firm of Bland & Gaunt, it is admitted by Smith that the contract was made with Bland.

The instruction is further erroneous in that it instructed the jury that it might find for the plaintiff if the guaranty company "authorized" the appellees to complete Harper's contract. The petition alleges that the appellant "requested" the appellees to complete Harper's contract; not that it "authorized" them to do so. The using of the term "authorized" under the pleadings and the evidence in this case, was calculated to mislead the jury as to the issue upon which a recovery was dependent.

For the errors indicated the judgment is reversed and the action remanded for further proceedings.